Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

[additional counsel on signature page]

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

ROY LUI, derivatively on behalf of ZOGENIX, INC.,

     Plaintiff,

     v.

STEPHEN J. FARR, MICHAEL P. SMITH, LOUIS C. BOCK, JAMES B. BREITMEYER, CAM L. GARNER, ROGER L. HAWLEY, ERLE T. MAST, RENEE P. TANNENBAUM, and MARK WIGGINS,

     Defendants,

     and

ZOGENIX, INC.,

     Nominal Defendant.

Case No.:

**DEMAND FOR JURY TRIAL**

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## INTRODUCTION

Plaintiff Roy Lui ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Zogenix, Inc. ("Zogenix" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Stephen J. Farr, Michael P. Smith, Louis C. Bock, James B. Breitmeyer, Cam L. Garner, Roger Hawley, Erle T. Mast, Renee P. Tannenbaum, and Mark Wiggins (collectively, the "Individual Defendants," and together with Zogenix, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Zogenix, unjust enrichment, waste of corporate assets, and violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, he alleges the following based upon personal knowledge as to his and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Zogenix, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Zogenix's directors and officers from February 6, 2019 through April 8, 2019 (the "Relevant Period").

2.      Zogenix is a pharmaceutical company specializing in the research and development of therapies intended to treat rare diseases affecting the central nervous system.  In 2014, Zogenix acquired U.K.-based pharmaceutical company, Brabant Pharma Limited. With its acquisition, Zogenix obtained worldwide development and commercialization  rights to the Company's current lead product candidate, Fintepla, or ZX008, a low-dose fenfluramine compound for the treatment of Dravet syndrome and Lennox-Gastaut syndrome, two rare forms of epilepsy afflicting children in their first years of life.

3.      Fenfluramine is the ingredient that was used in certain anti-obesity drugs beginning in the 1970s in the U.S., including Pondimin, among others.  Because the toxicology of fenfluramine had been studied in connection with the applications to the Food and Drug Administration ("FDA") for the approval of Pondimin and other drugs, Zogenix could rely on these studies under Section 505(b)(2) of the Federal Food, Drug, and Cosmetic Act ("FFDCA") in submitting its New Drug Application ("NDA") to the FDA.  The NDA is the means by which a drug applicant formally proposes that the FDA approve a new drug for sale and marketing in the U.S. Pursuant to Section 505(b)(2), an applicant may rely on publicly available literature regarding ingredients of the applicant's new drug, and thus forego costly and time-consuming clinical trials.

4.      Beginning in 2015 and leading up to the completion of the NDA in 2019, the Individual Defendants consistently represented that Zogenix's strategy for ZX008's approval was to rely on Section 505(b)(2) for its NDA.  The Individual Defendants, moreover, cited to discussions with the FDA about this strategy, and publicly stated that the FDA was aware of the strategy and would allow it. The Company began its Phase 3 clinical trials of ZX008 in 2016.

5.      On July 12, 2018, the Company announced positive results from its most recent Phase 3 trials.  Analysts and investors responded positively to this news and the Company's touted strategy with respect to Section 505(b)(2), with some analysts estimating that the Company could generate revenues as high as $2 billion from sales of ZX008.  Following Zogenix's announcement, the price of Company stock shot up from $46.30 per share on July 11, 2018 to $55.90 per share on July 12, 2018.  On the following day, the stock price increased again to $61.35 per share. However, unbeknownst to the investing public at the time, the Company would not properly follow through with its purported strategy.

6.      When the NDA was ultimately submitted in February 2019, the Individual Defendants recklessly and fraudulently omitted the toxicology studies from the NDA, contradicting their numerous representations and SEC filings  Rather than disclosing this to investors, the Individual Defendants caused the Company to announce the "completion" of the NDA, without any indication that the toxicology studies had been omitted.  On April 8, 2019, the Company disclosed that the FDA had rejected the NDA outright, notifying Zogenix of their determination in a Refuse to File Letter ("RTF").

Verified Shareholder Derivative Complaint

In the RTF, the FDA informed the Company that it would not file the NDA because the Company failed to submit the non-clinical studies necessary to evaluate the toxicity of the chronic administration of fenfluramine.  News of the RTF reverberated through the marketplace, causing the price of the Company's stock to nosedive from $51.85 per share at the close of trading on April 8, 2019, to $39.96 per share at the close of trading on April 9, 2019, representing a loss of approximately $500 million in the Company's market capitalization.

7.      In subsequent statements to investors, the Company admitted that the toxicology studies were publicly available and could have been incorporated into the NDA, and further admitted that the Company intended to incorporate the studies in the NDA.  The Company disclosed in subsequent statements, however, that in spite of its longstanding position that it would rely on Section 505(b)(2), it left out the toxicology studies in the end because it felt that its own clinical data was strong enough to preclude the need for the historical studies.  The Company failed to explain why it did not simply use both sets of data.

8.      During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company had not submitted the publicly available toxicology literature regarding fenfluramine pursuant to Section 505(b)(2) along with the NDA for ZX008; (2) as such, the Company was exposed to a substantial risk that the FDA would reject the application; and (3) the Company failed to maintain internal controls.

9.      As a result of the foregoing, the Individual Defendants' and the Company's public statements were materially false and misleading at all relevant times.  The Individual Defendants failed to correct and caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

10.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain internal controls and knowingly or recklessly subjected the Company to the heightened and undisclosed risk that its NDA for ZX008 would be rejected for failing to include critical studies necessary to evaluate the toxicity of the chronic administration of fenfluramine.

11.     Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations.  Upon information and belief, 12,000 shares of the Company's common stock were repurchased at inflated prices during the Relevant Period.[1] Furthermore, three of the Individual Defendants engaged in insider sales during the Relevant Period while the stock was artificially inflated, netting proceeds of over $7 million collectively.

12.     In light of the Individual Defendants' misconduct, which has subjected Zogenix, its President and Chief Executive Officer ("CEO"), and its Executive Vice President and Chief Financial Officer ("CFO"), to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action"), the need to resubmit the NDA, the losses resulting from the FDA's rejection of the NDA for filing, the need to undertake internal investigations, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

13.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's and CFO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority

---

[1] As of this date, the Company has not disclosed the price it paid per share for these repurchases.

of Zogenix's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

15.    Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.    The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

19.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

20.    Venue is proper in this District because Zogenix and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

21.    Plaintiff is a current shareholder of Zogenix common stock. Plaintiff has continuously held Zogenix common stock since before the Relevant Period.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Nominal Defendant Zogenix**

22.     Zogenix is a Delaware corporation with its principal executive offices at 5959 Horton Street, Emeryville, California, 94608.    Zogenix's shares trade on the NASDAQ Composite ("NASDAQ") under the ticker symbol "ZGNX."

**Defendant Stephen J. Farr**

23.     Defendant Stephen J. Farr ("Farr") co-founded Zogenix and is the President and Chief Executive Officer.  He has served as the President and as a member of the Board of Directors since 2006.  According to the Company's Schedule 14A filed with the SEC on April 9, 2019 (the "2019 Proxy Statement"), as of March 26, 2019, Defendant Farr beneficially owned 640,125 shares of the Company's common stock, which represented 1.5% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on March 26, 2019 was $54.30, Farr owned approximately $34.76 million worth of Zogenix stock.

24.     For the fiscal year ended December 31, 2018, Defendant Farr received $6,650,252 in compensation from the Company.  This included $545,000 in salary, $853,000 in stock awards, $4,927,552 in option awards, $319,200 in non-equity incentive plan compensation, and $5,500 in all other compensation.

25.     The Company's 2019 Proxy Statement stated the following about Defendant Farr:

*Stephen J. Farr, Ph.D.* is one of our co-founders and has served as our President and as a member of our board of directors since our inception in May 2006. Dr. Farr has served as our Chief Executive Officer since April 2015 and served as our Chief Operating Officer from our inception to March 2013. From 1995 to August 2006, Dr. Farr held positions of increasing responsibility within Aradigm Corporation, and he served most recently as Senior Vice President and Chief Scientific Officer with responsibility for research and development as well as business development. From 1986 to 1994, Dr. Farr was a tenured professor at the Welsh School of Pharmacy, Cardiff University, United Kingdom, concentrating in the area of biopharmaceutics. Dr. Farr currently serves on the board of directors of SteadyMed Therapeutics, Inc., a publicly-traded company, as well as Oscillari, LLC and Flow Pharma, Inc. Dr. Farr is an adjunct Professor in the Department of Pharmaceutics, School of Pharmacy, Virginia Commonwealth University. Dr. Farr is a registered pharmacist in the United Kingdom and obtained his Ph.D. degree in Pharmaceutics from the University of Wales. As one of our co-founders and having served as our President since May 2006, Dr. Farr's extensive knowledge of our business, history and culture, as well as his significant experience in research and development and

thorough knowledge of the pharmaceutical product development process, contributed to our board of directors' conclusion that he should serve as a director of our company.

26.     Upon information and belief, Defendant Farr is a citizen of California.

**Defendant Smith**

27.     Defendant Michael P. Smith ("Smith") has served as Zogenix's executive Vice President, Chief Financial Officer, Treasurer and Secretary since January 2017. According to the 2019 Proxy Statement, as of March 26, 2019, Defendant Smith beneficially owned 93,604 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 26, 2019 was $54.30, Kress owned approximately $5.08 million worth of Zogenix stock.

28.     For the fiscal year ended December 31, 2018, Defendant Smith received $1,933,788 in compensation from the Company. This included $396,250 in salary, $266,563 in stock awards, $1,154,895 in option awards, $171,000 in non-equity incentive plan compensation, and $5,080 in all other compensation.

29.     The Company's 2019 Proxy Statement stated the following about Defendant Smith:

*Michael P. Smith* has served as our Executive Vice President, Chief Financial Officer, Treasurer and Secretary since January 2017. From January 2015 through December 2016, Mr. Smith served as Chief Financial Officer of Raptor Pharmaceutical Corp., a global biopharmaceutical company focused on the development and commercialization of transformative therapeutics for rare diseases that was acquired by Horizon Pharma plc. in October 2016. In this role, he was responsible for the finance, accounting, corporate development, corporate strategy, intellectual property, and information management business functions. From May 2012 to January 2015, Mr. Smith served as Chief Financial and Business Advisor at Catalyst Biosciences. Prior to that role, from September 2010 to April 2011, he was Vice President of Business Development at iPierian, Inc., and from June 2006 to July 2009, he served as Head of Business Development and Chief Financial Officer of Memory Pharmaceuticals Corporation. Mr. Smith received his B.S. in Commerce from the University of Virginia and his M.B.A. from the Haas School of Business at the University of California, Berkeley.

30.     Upon information and belief, Defendant Smith is a citizen of California.

**Defendant Bock**

31.     Defendant Louis C. Bock ("Bock") has served as a Company director since 2006. According to the 2019 Proxy Statement, as of March 26, 2019, Defendant Bock beneficially owned 62,000 shares of the Company's common stock. Given that the price per share of the Company's

common stock at the close of trading on March 26, 2019 was $54.30, Bock owned approximately $3.37 million worth of Zogenix stock.

32.     For the fiscal year ended December 31, 2018, Defendant Bock received $477,899 in compensation from the Company. This included $60,000 in fees earned or paid in cash, and $417,899 in option awards.

33.     The Company's 2019 Proxy Statement stated the following about Defendant Bock:

*Louis C. Bock* has served as a member of our board of directors since August 2006. Since August 2014, Mr. Bock has served as a Venture Partner at Santé Ventures, a venture capital firm. From September 1997 to July 2014, he was Managing Director of Scale Venture Partners, a venture capital firm. Previously, Mr. Bock held various positions in research, project management, business development and sales at Gilead Sciences, Inc., from September 1989 to September 1997. Prior to Gilead, he was a research associate at Genentech, Inc. from November 1987 to September 1989. He currently serves as a director of Orexigen Therapeutics, Inc., a publicly-traded biotechnology company, as well as several private companies including Ascenta Therapeutics, Inc. and Cardiokinetics, Inc. Mr. Bock served as a director for Heat Biologics, Inc., a publicly-traded biotechnology company, from September 2013 to April 2016. In addition, Mr. Bock is responsible for Scale Venture Partners' prior investments in Seattle Genetics, Prestwick Pharmaceuticals, Inc. and Somaxon Pharmaceuticals, Inc. Mr. Bock received his B.S. in Biology from California State University, Chico and his M.B.A. from California State University, San Francisco. Mr. Bock's extensive clinical and leadership experience in the biotechnology and biopharmaceutical industries, including experience in research, project management, business development and sales, and his membership on other companies' boards of directors, including positions on other audit and nominating/corporate governance committees, contributed to our board of directors' conclusion that he should serve as a director of our company.

**Defendant Breitmeyer**

34.     Defendant James B. Breitmeyer ("Breitmeyer") has served as a Company director since 2014. According to the 2019 Proxy Statement, as of March 26, 2019, Defendant Breitmeyer beneficially owned 80,875 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 26, 2019 was $54.30, Breitmeyer owned approximately $4.39 million worth of Zogenix stock.

35.     For the fiscal year ended December 31, 2018, Defendant Breitmeyer received $465,399 in compensation from the Company. This included $47,500 in fees earned or paid in cash, and $417,899 in option awards.

36.     The Company's 2019 Proxy Statement stated the following about Defendant Breitmeyer:

*James B. Breitmeyer*, M.D., Ph.D. has served as a member of our board of directors since March 2014. Since August 2015, Dr. Breitmeyer has served as President, CEO and Director of Oncternal Therapeutics, Inc. a clinical-stage oncology biotechnology company. Previously, he served as President of Bavarian Nordic, Inc. and Executive Vice President of Bavarian A/S, a multinational corporation headquartered in Denmark, from February 2013 to July 2015. He previously served as the acting Chief Medical Officer of our company from August 2012 to February 2013 in an advisory capacity, the Executive Vice President of Development and Chief Medical Officer of Cadence Pharmaceuticals Inc., from August 2006 to August 2012, and the Chief Medical Officer of Applied Molecular Evolution Inc., a wholly-owned subsidiary of Eli Lilly and Co. from December 2001 to August 2006. Dr. Breitmeyer has also served as President and Chief Executive Officer of the Harvard Clinical Research Institute and held a variety of positions at Serono Laboratories Inc. Dr. Breitmeyer served as a founding collaborator and scientific advisor to Immunogen Inc., and held clinical and teaching positions at the Dana Farber Cancer Institute and Harvard Medical School. Dr. Breitmeyer earned his B.A. in Chemistry from the University of California, Santa Cruz and his M.D. and Ph.D. from Washington University School of Medicine and is Board Certified in Internal Medicine and Oncology. Dr. Breitmeyer's extensive experience in the biopharmaceutical industry, including providing strong executive leadership to numerous biopharmaceutical companies, and significant expertise in the medical field, contributed to our board of directors' conclusion that he should serve as a director of our company.

37.     Upon information and belief, Defendant Breitmeyer is a citizen of California.

**Defendant Garner**

38.     Defendant Cam L. Garner ("Garner") is a co-founder of the Company and has served as Chairman of the Board since 2006. According to the 2019 Proxy Statement, as of March 26, 2019, Defendant Garner beneficially owned 95,843 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 26, 2019 was $54.30, Garner owned approximately $5.20 million worth of Zogenix stock.

39.     For the fiscal year ended December 31, 2018, Defendant Garner received $517,899 in compensation from the Company. This included $100,000 in fees earned or cash paid, and $417,899 in option awards.

40.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Garner made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| February 12, 2019 | 12,405 | $46.85 | $581,174 |
| February 26, 2019 | 4,756 | $50.00 | $237,800 |
| February 27, 2019 | 869 | $50.00 | $43,450 |
| March 1, 2019 | 15,250 | $50.00 | $762,500 |

Thus, in total, before the fraud was exposed, he sold 33,280 Company shares on inside information, for which he received approximately $1.62 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

The Company's 2019 Proxy Statement stated the following about Defendant Garner:

*Cam L. Garner* is one of our co-founders and has served as chairman of our board of directors since August 2006. Mr. Garner co-founded specialty pharmaceutical companies Cadence Pharmaceuticals, Inc. (acquired by Mallinckrodt plc in March 2014), Somaxon Pharmaceuticals, Inc. (sold to Pernix Therapeutics in March 2013), Evoke Pharma, Inc., Elevation Pharmaceuticals, Inc. (sold to Sunovion Pharmaceuticals Inc. in 2012), DJ Pharma (sold to Biovail Corporation in 2000), Verus Pharmaceuticals, Inc., Xcel Pharmaceuticals, Inc. (acquired by Valeant Pharmaceuticals International in 2005), Neurelis, Inc., Meritage Pharma, Inc. (sold to Shire plc in February 2015), and most recently, Kalyra Pharmaceuticals, Inc., OrPro Therapeutics, Inc., Alastin SkinCare and Zavante, Inc. He previously served as chairman of Cadence from May 2004 until March 2014, and served as chairman of Verus, Elevation and Meritage until their acquisition and Evoke since January 2007. Mr. Garner was Chief Executive Officer of Dura Pharmaceuticals, Inc. from 1989 to 1995 and its Chairman and Chief Executive Officer from 1995 to 2000, when it was sold to Elan. In addition to Zogenix, Mr. Garner currently serves as Chairman of Evoke Pharma, a publicly-traded company, Kalyra Pharamaceuticals, OrPro, Alastin and Zavante, and serves on the Board of Directors of Aegis and Neurelis. Mr. Garner is also Chairman-elect and serves on the Executive Committee of UCSD Moores Cancer Center, San Diego. Mr. Garner earned his B.A. in Biology from Virginia Wesleyan College and an M.B.A. from Baldwin-Wallace College. As one of our co-founders and having served as our chairman since August 2006, Mr. Garner's extensive knowledge of our business, history and culture, his extensive experience as a board member of multiple publicly-traded and privately-held companies, and expertise in developing, financing and providing strong executive leadership to numerous biopharmaceutical companies, contributed to our board of directors' conclusion that he should serve as a director of our company.

41.     Upon information and belief, Defendant Garner is a citizen of California.

**Defendant Hawley**

42.     Defendant Roger L. Hawley ("Hawley") is a co-founder of the Company and served as a Company director from August 2006 until his resignation on March 31, 2019. He served as the

Company's CEO from 2006 to 2015. According to the 2019 Proxy Statement, as of December 31, 2018, Defendant Hawley beneficially owned 365,773 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 26, 2019 was $54.30, Hawley owned approximately $19.86 million worth of Zogenix stock.

43.    For the fiscal year ended December 31, 2018, Defendant Hawley received $457,899 in compensation from the Company. This included $40,000 in fees earned or cash paid, and $417,899 in option awards.

44.    During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Hawley made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| March 1, 2019 | 4,300 | $50.00 | $1,138,500 |
| March 13, 2019 | 21,211 | $53.10 | $1,126,304 |
| March 14, 2019 | 38,789 | $52.93 | $2,053,101 |
| March 29, 2019 | 20,700 | $55.00 | $1,138,500 |

Thus, in total, before the fraud was exposed, he sold 85,000 Company shares on inside information, for which he received approximately $5.46 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

45.    The Company's Schedule 14A filed with the SEC on April 13, 2018 (the "2018 Proxy Statement") stated the following about Defendant Hawley:

*Roger L. Hawley* is one of our co-founders and has served as a member of our board of directors since August 2006 and as our Chief Executive Officer from August 2006 to April 2015. Mr. Hawley currently serves as board chairman of Darè Bioscience, a privately-held women's health company in San Diego, and currently serves as an advisor to Alveo Technologies, where he has been a board member since July 2015. Mr. Hawley was also a startup investor and board member of Alios BioPharma from 2006 to 2008, which was acquired by Johnson & Johnson in November 2014. Mr. Hawley was a member of the board of directors of Cypress Bioscience from 2007 to 2011 and Targeted Genetics from 2006 to 2010, both previously publicly-traded pharmaceutical companies. From 2003 to 2006 he served as Executive Vice President, Commercial and Technical Operations for InterMune, Inc., a biopharmaceutical company focused on therapies in

hepatology and pulmonology. From 2002 to 2003, Mr. Hawley was the Chief Commercial Officer at Prometheus Laboratories Inc., a specialty pharmaceutical and diagnostics company. From 2001 to 2002, Mr. Hawley served as General Manager & Vice President of Sales and Marketing at Elan Pharmaceuticals in San Diego. From 1987 to 2001, Mr. Hawley held a broad range of management positions in commercial operations, alliance/ partnership management, and regional/national sales and corporate finance at Glaxo/Glaxo Wellcome/GSK. His last position at GSK in 2001 was Vice President of Sales-CNS/GI Division in North Carolina. From 1976 to 1987, he held various financial management positions with Marathon Oil Company, including serving four years in London, United Kingdom. While at Marathon, he was a certified treasury manager and a certified public accountant. Mr. Hawley holds a B.Sc. in Accounting from Eastern Illinois University. As one of our co-founders and having served as our Chief Executive Officer for nearly ten years, Mr. Hawley's extensive knowledge of our business, history and culture, as well as over 20 years of experience in the pharmaceutical industry, including providing strong executive leadership to numerous biopharmaceutical companies, contributed to our board of directors' conclusion that he should serve as a director of our company.

46.     Upon information and belief, Defendant Hawley is a citizen of California.

**Defendant Mast**

47.     Defendant Erle T. Mast ("Mast") has served as a Company director since 2008. He also serves as a member of the Audit Committee. According to the 2019 Proxy Statement, as of March 26, 2019, Defendant Mast beneficially owned 91,499 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 26, 2019 was $54.30, Mast owned approximately $4.97 million worth of Zogenix stock.

48.     For the fiscal year ended December 31, 2018, Defendant Mast received $487,899 in compensation from the Company. This included $70,000 in fees earned or paid in cash, and $417,899 in option awards.

49.     The Company's 2019 Proxy Statement stated the following about Defendant Mast:

*Erle T. Mast* has served as a member of our board of directors since May 2008. Mr. Mast was a co-founder of and served as Executive Vice President, Chief Financial Officer with Clovis Oncology, Inc., a biotechnology company, from May 2009 through March 2016. From July 2002 to May 2008, Mr. Mast served as Executive Vice President and Chief Financial Officer of Pharmion Corporation, until its acquisition by Celgene Corporation. From 2000 to 2002, after Elan Pharma International Ltd. acquired Dura Pharmaceuticals, Inc., Mr. Mast served as Chief Financial Officer for the Global Biopharmaceuticals business unit of Elan. From 1997 to 2000, Mr. Mast served as Vice President of Finance for Dura Pharmaceuticals. From 1984 to 1997, Mr. Mast held positions of increasing responsibility at Deloitte & Touche, LLP, serving most recently as partner, where he

provided accounting, auditing and business consulting services to companies in various industries, including the healthcare, pharmaceutical, biotech and manufacturing industries. Mr. Mast served as a director for Sienna Biopharmaceuticals, Inc. from 2017 to 2018, for Somaxon Pharmaceuticals, Inc. from 2008 to 2013 and for Receptos Inc. from 2013 to 2015, each publicly traded biotechnology companies. As previously disclosed, in September 2018, the SEC entered into a settlement with Clovis and certain of its executive officers, including Mr. Mast, relating to an SEC investigation into whether Clovis had violated federal securities laws in connection with Clovis' disclosure in November 2015 that the FDA had requested additional clinical data on the efficacy and safety of a product under development by Clovis. Pursuant to the settlement, without admitting or denying the SEC's allegations, Mr. Mast paid a civil penalty and disgorgement and agreed to a standard injunction against future violations of those provisions of the federal securities laws. The settlement agreement did not allege that Clovis or any of its current or former officers, including Mr. Mast, engaged in any intentional fraud or misconduct and it does not preclude Mr. Mast from continuing to serve as a director or officer of a public company. Mr. Mast received his degree in Business Administration from California State University, Bakersfield. Mr. Mast's experience as a chief financial officer of various companies in the healthcare industry and in providing accounting, auditing and consulting services while at Deloitte & Touche, LLP, as well as his expertise in management, accounting, treasury, and finance functions, contributed to our board of directors' conclusion that he should serve as a director of our company.

**Defendant Tannenbaum**

50. Defendant Renee P. Tannenbaum ("Tannenbaum") has served as a Company director since 2015. According to the 2019 Proxy Statement, as of March 26, 2019, Defendant Tannenbaum beneficially owned 65,872 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 26, 2019 was $54.30, Tannenbaum owned approximately $3.58 million worth of Zogenix stock.

51. For the fiscal year ended December 31, 2018, Defendant Tannenbaum received $462,899 in compensation from the Company. This included $45,000 in fees earned or paid in cash, and $417,899 in option awards.

52. During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Tannenbaum made the following sale of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| March 6, 2019 | 17,503 | $ 50.65 | $ 886,526 |

Her insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

53.    The Company's 2019 Proxy Statement stated the following about Defendant Tannenbaum:

> *Renee P. Tannenbaum, Pharm.D.* has served as a member of our board of directors since February 2015. Dr. Tannenbaum currently serves as Vice President of Global Alliances at Halozyme, Inc., where she is responsible for leading the team that executes the company's alliances through partnerships and collaborations. Dr. Tannenbaum was previously Head of Global Customer Excellence at AbbVie from October 2012 to January 2016, where she was responsible for building commercial capabilities for the organization. Previously, Dr. Tannenbaum served as President of Myrtle Potter & Company, LLC, a global life sciences consulting and advisory firm from April 2011 to October 2012 and Executive Vice President and Chief Commercial Officer at Elan Pharmaceuticals, Inc., from May 2009 to January 2011, where she was responsible for revenue generation for Elan's marketed products, preparing for the commercialization of the company's pipeline, including its Alzheimer's portfolio, and strengthening the company's overall commercial capabilities. Prior to her role at Elan, Dr. Tannenbaum was at Novartis Pharma AG for three years, where she led the Global Commercial Operations organization. Prior to that, Dr. Tannenbaum spent nine years at Bristol Myers Squibb and 16 years at Merck and Company, Inc. where she held a variety of leadership positions in operations and general management. Dr. Tannenbaum served as a director to Nordic Nanovector ASA, a publicly-traded company in Norway, and Cipher Pharmaceuticals, Inc. a Canadian publicly-traded company, from April to August 2016, Sharps Compliance Inc. from November 2012 to November 2014 and Immune Pharmaceuticals, Inc., a publicly-traded company, from August 2011 to October 2012. Dr. Tannenbaum retains a faculty position at the University of the Sciences' Mayes College of Healthcare Business and Policy and serves as the Dean's Professor. Dr. Tannenbaum received her Doctor of Pharmacy degree from the Philadelphia College of Pharmacy and Sciences, her MBA from Temple University, and her Bachelor of Science degree in Pharmacy from the University of Connecticut. Dr. Tannenbaum's extensive experience in the biopharmaceutical industry, including providing strong executive leadership to numerous biopharmaceutical companies, contributed to our board of directors' conclusion that she should serve as a director of our company.

54.    Upon information and belief, Defendant Tannenbaum is a citizen of California.

**<u>Defendant Wiggins</u>**

55.    Defendant Mark Wiggins ("Wiggins") has served as a Company director since 2011. According to the 2019 Proxy Statement, as of March 26, 2019, Defendant Wiggins beneficially owned 89,625 shares of the Company's common stock. Given that the price per share of the Company's

common stock at the close of trading on March 26, 2019 was $54.30, Wiggins owned approximately $4.87 million worth of Zogenix stock.

56. For the fiscal year ended December 31, 2018, Defendant Wiggins received $475,399 in compensation from the Company. This included $57,500 in fees earned or cash paid, and $417,899 in stock awards.

57. The Company's 2019 Proxy Statement stated the following about Defendant Wiggins:

*Mark Wiggins* has served as a member of our board of directors since May 2011. Until 2015 Mr. Wiggins was Senior Vice President of Business Development with Elcelyx Therapeutics, Inc., a biotechnology company. Previously, he served as Chief Business Officer with Mpex Pharmaceuticals, a biopharmaceutical company, until its acquisition by Axcan Pharma, Inc. in 2011. From May 1998 to February 2009, Mr. Wiggins was employed at Biogen Idec, Inc., and its predecessor Idec Pharmaceuticals Corp., biotechnology companies, where he most recently served as Executive Vice President of Business Development. At Idec Pharmaceuticals, Mr. Wiggins was a member of the management committee for the collaboration with Genentech Inc. on Rituxan®. Prior to Biogen Idec, Mr. Wiggins spent fifteen years in a number of positions of increasing responsibility in marketing, marketing research and business development at Hybridon, Inc., Schering-Plough Corporation (now Merck), Johnson & Johnson and Pfizer, Inc. Mr. Wiggins' business development transaction experience includes closing over 20 licensing deals and several global corporate partnerships and company acquisitions. Mr. Wiggins earned his B.S. degree in Finance from Syracuse University and his M.B.A. from the University of Arizona. Mr. Wiggins' expertise in business development activities and the marketing of pharmaceutical products, as well as his extensive management experience within the biopharmaceutical industry, contributed to our board of directors' conclusion that he should serve as a director of our company.

58. Upon information and belief, Defendant Wiggins is a citizen of California.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

59. By reason of their positions as officers, directors, and/or fiduciaries of Zogenix and because of their ability to control the business and corporate affairs of Zogenix, the Individual Defendants owed Zogenix and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Zogenix in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Zogenix and its shareholders so as to benefit all shareholders equally.

60.     Each director and officer of the Company owes to Zogenix and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

61.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Zogenix, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

62.     To discharge their duties, the officers and directors of Zogenix were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

63.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Zogenix, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Zogenix's Board at all relevant times.

64.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate

information. Additionally, the Individual Defendants had a duty not to cause the Company to waste corporate assets by making the Company repurchase its own stock at artificially inflated prices, to the detriment of the Company and its shareholders.

65.     To discharge their duties, the officers and directors of Zogenix were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Zogenix were required to, among other things:

       (a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Zogenix's own Code of Business Conduct and Ethics;

       (b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

       (c)     remain informed as to how Zogenix conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

       (d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Zogenix and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

       (e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Zogenix's operations would comply with all applicable laws and Zogenix's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

       (f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

66.     Each of the Individual Defendants further owed to Zogenix and the shareholders the duty of loyalty requiring that each favor Zogenix's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

67.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Zogenix and were at all times acting within the course and scope of such agency.

68.     Because of their advisory, executive, managerial, and directorial positions with Zogenix, each of the Individual Defendants had access to adverse, non-public information about the Company.

69.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Zogenix.

## **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

70.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

71.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Sections 10(b) and 20(a) of the Exchange Act.

72.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Zogenix, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

73.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

74.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Zogenix and was at all times acting within the course and scope of such agency.

## ZOGENIX'S CODE OF CONDUCT

75.     The Company's Code of Business Conduct and Ethics (the "Code of Conduct"), states that: "[a]ll employees and directors have a duty to report any known or suspected violation of this Code, including violations of the laws, rules, regulations or policies that apply to the Company."

76.     The Code of Conduct provides, under the section titled, "Compliance with Laws and Regulations," that each employee and director has "an obligation to comply with all laws, rules and regulations applicable to the Company's operations," including laws covering "the development, testing, approval, manufacture, marketing and sale of our pharmaceutical products and product candidates[.]"

77.     The Code of Conduct contains a section promising "Accuracy of Financial Reports and Other Public Communications," stating, in relevant part:

As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

The same section of the Code of Conduct goes on to state:

The Company's principal financial officers and other employees working in the Finance Department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

78.     The Code of Conduct also provides that the Company's employees are "prohibited from trading in the stock or other securities of the Company while in possession of material, nonpublic information about the Company."

79.     Under the section titled "Company Records," the Code of Conduct provides:

Accurate and reliable records are crucial to our business. Our records are the basis of our earnings statements, financial reports, regulatory submissions and many other aspects of our business and guide our business decision- making and strategic planning. Company records include financial records, personnel records, records relating to our product development, clinical development, manufacturing and regulatory submissions and all other records maintained in the ordinary course of our business.

All Company records must be complete, accurate and reliable in all material respects. The Company has a formal document retention policy that each employee and director must follow with respect to Company records within such employee's or director's control. Please contact your supervisor or the Company's Chief Financial Officer or Compliance Officer, to obtain a copy of this policy or with any questions concerning the policy.

80.     Under the section titled "Protection and Use of Company Assets," the Code of Conduct provides that, "[e]mployees should protect the Company's assets and ensure their efficient use for legitimate business purposes only. Theft, carelessness and waste have a direct impact on the Company's profitability. The use of Company funds or assets, whether or not for personal gain, for any unlawful or improper purpose is prohibited."

81.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the scheme to cause the Company to fail to submit with the NDA for ZX008 the non-

clinical studies necessary to evaluate the toxicity of the chronic administration of fenfluramine, to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and Sections 10(b) and 20(a) of the Exchange Act. Moreover, three of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and compete in an honest and ethical manner.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

82.     Zogenix is a pharmaceutical company based in Emeryville, California that specializes in the research and development of therapies for pain-related and central nervous system disorders.  In October 2014, Zogenix acquired Brabant Pharm Limited, a U.K.-based pharmaceutical company that was in the process of developing ZX008, a drug candidate intended to treat epileptic seizures, specifically those related to Dravet syndrome.  Dravet syndrome is a severe form of epilepsy that begins in infancy and is characterized by frequent, prolonged seizures.

83.     ZX008, which the Company has branded "FINTAPLA," is now Zogenix's leading drug candidate, and its anticipated approval by the FDA and subsequent marketing was expected to reap significant profits for the Company.

84.     The Company started Phase 3 clinical trials for ZX008 in 2016, and on July 12, 2018 it announced positive top-line results in connection with its latest Phase 3 study.  Zogenix disclosed that the clinical trials established that ZX008 was more effective than Dravet syndrome therapies then on the market, bolstering its plans to seek regulatory approval in the U.S. and Europe in fourth quarter 2018.

85.      On this news, the price of Zogenix stock shot up from $46.30 per share on July 11, 2018 to $55.90 per share on July 12, 2018.  On the following day, the stock price made another run up to $61.35 per share. Analysts estimated that ZX008 could bring in revenues of up to $2 billion for the Company.

86.     In August 2018, the Company made a follow-on public offering for the sale of 6,000,000 shares of common stock at a price of $52 per share, raising $292.9 million in the process.

### Section 505(b)(2) of the Federal Food, Drug, and Cosmetic Act

87.     Pursuant to Section 505(b)(2) of the FFDCA, an applicant is permitted to incorporate, as a cost-saving measure, publicly available information when submitting an NDA to the FDA.

88.     Section 505(b)(2) of the FFDCA allows an applicant to submit an NDA that contains full reports of investigations of safety and effectiveness from studies not conducted by or for the applicant and for which the applicant has not obtained a right of reference.

89.     Under this section, an applicant can use published literature as well as the FDA's own findings of safety and effectiveness for previously approved products based on prior pre-clinical trials that were conducted for the previously approved product.  According to FDA guidelines:

> An applicant should submit a 505(b)(2) application if approval of an application will rely to any extent on published literature (a literature-based 505(b)(2)). If the applicant has not obtained a right of reference to the raw data underlying the published study or studies, the application is a 505(b)(2) application; if the applicant obtains a right of reference to the raw data, the application may be a full NDA (i.e., one submitted under section 505(b)(1)). An NDA will be a 505(b)(2) application if any of the specific information necessary for approval is obtained from literature or from another source to which the applicant does not have a right of reference, even if the applicant also conducted clinical studies to support approval. Note, however, that this does not mean any reference to published general information (e.g., about disease etiology, support for particular endpoints, methods of analysis) or to general knowledge causes the application to be a 505(b)(2) application. Rather, reference should be to specific information (clinical trials, animal studies) necessary to the approval of the application.

90.     At the time the NDA is submitted, the FDA can either accept the application for review, or reject it outright if the NDA fails to meet certain threshold criteria. 21 CFR § 314.50 requires that an NDA include certain supporting information along with the application, including clinical and non-clinical data.  If these criteria are met, the FDA accepts the NDA for filing, and proceeds with its evaluation of the NDA.  21 CFR § 314.101.

91.     If the threshold application criteria are not met, then the FDA may refuse to file the NDA. 21 CFR § 314.101(d).

*The Company's 505(b)(2) Strategy for the ZX008 NDA*

92.     ZX008 contains low dosage amounts of fenfluramine, which had been used in appetite suppressant drugs such as Pondimin and Fen-Phen.[2]  In applying to the FDA for approval of those drugs, the Pondimin applicants conducted certain toxicology studies for the chronic administration of fenfluramine, and certain aspects of those studies are publicly available.  Because ZX008 contains fenfluramine, which had also been an ingredient of the previously-approved drug Pondimin, the Defendants indicated to the investing public and the FDA that they would utilize Section 505(b)(2) and rely on the toxicity studies for Pondimin as part of their strategy for submission of the ZX008 NDA.  As discussed above, reliance on previously conducted studies provided an advantage in that the Company would not have to incur the expense of time-consuming trials related to the toxicology of fenfluramine.

93.     Prior to the NDA submission, and long before the Relevant Period began, the Company, at the direction of the Individual Defendants, as well as other Company representatives, consistently held out that they would utilize Section 505(b)(2) in order to rely on the chronic toxicity studies that were conducted in connection with the Pondimin application.

94.     As early as July 2015, Zogenix Executive Vice President and Chief Development Officer, Gail Farfel, stated on an investor call that the FDA "confirmed that a 505(b)(2) path for the NDA submission [was] acceptable . . ."  During an investor conference call held August 10, 2015, Ms. Farfel again emphasized to investors that the FDA had "confirmed that a 505(b)(2) NDA submission [was] acceptable . . ."

95.     Defendant Farr similarly stated during an investor presentation on November 18, 2015 that the Company had "confirmed the 505(b)(2) NDA pathway in the United States."

96.     Zogenix's Form 10-K filed with the SEC for the fiscal year ended December 31, 2017 (the "2017 10-K"), highlighted that the Company would utilize Section 505(b)(2) in connection with its NDA for ZX008.  In explaining the advantages of Section 505(b)(2), the 2017 10-K stated an "applicant may rely upon published literature and the FDA's previous findings of safety and effectiveness for an approved product based on the prior pre-clinical or clinical trials conducted for the approved product."

---

[2] The drugs were subsequently banned because they were linked to heart valve problems, among other conditions.

97.     The foregoing statements led the market to believe that the Company would rely on Section 505(b)(2) and incorporate the Pondimin toxicity studies in submitting the NDA.  Indeed, the Company stated its intention to do so directly to analysts in private meetings.  The following excerpt from an October 2015 analyst report at Brean Capital, LLC illustrates this point:

> Zogenix's ZX008 IND filed on time and we expect a Phase III trial to start during Q4, 2015 as guided. One thing we observed with this management team is that they have always been on time with regards to reaching R&D and regulatory milestones. The on time filing of an IND for ZX008 is incrementally positive for the company, but hardly a surprise to us. On September 28, 2015, the FDA published a new determination that Pondimin (fenfluramine HCl) tablets and Ponderex (fenfluramine HCl) capsules were withdrawn from sale for reasons of safety or effectiveness. The relevancy to ZX008 is that the active ingredient in ZX008 is also fenfluramine. The question is if this new FDA decision will impact the ZX008 regulatory filing strategy. *We communicated with management and they confirmed that the FDA decision would not impact the company's regulatory plans, which is consistent with our own understanding of the 505b(2) pathway where the application is allowed to reference information (mainly non clinical data) from the literature, not necessarily from an existing NDA.* With the company conducting two pivotal randomized controlled trials to establish fenfluramine safety and efficacy in Dravet syndrome and fenfluramine used for Dravet syndrome is at 5-30% dose of that used in weight-loss, we believe most of the safety and efficacy data for Dravet syndrome are likely to be generated from the upcoming Phase III studies, while most of the data reference is likely to be limited to pre-clinical data.

(Emphasis supplied).

98.     In November 2018, the Company met with the FDA to review the NDA filing and agree on issues such as ZX008 labeling, manufacturing, and product specifications.  Prior to the meeting, the Company had provided nonclinical sections of the NDA in accordance with a rolling submission plan the Company had arranged with the FDA. The Company planned on submitting chemistry and manufacturing/controls aspects of the NDA in December 2018.  As a result of the foregoing, Zogenix extended its NDA target date from fourth quarter 2018 to first quarter 2019.

## False and Misleading Statements

### February 6, 2019 8-K and Press Release

99.     On February 6, 2019, the Company filed a form 8-K announcing that it had completed the NDA for ZX008.  On the same day, it issued a press release to the same effect, titled "Zogenix

Submits New Drug Application to U.S. Food & Drug Administration and Marketing Authorization

Application to European Medicines Agency for FINTEPLA® for the Treatment of Dravet Syndrome."

The release stated in relevant part:

> EMERYVILLE, Calif., Feb. 06, 2019 (GLOBE NEWSWIRE) -- Zogenix, Inc. (NASDAQ:ZGNX), a global pharmaceutical company developing rare disease therapies, today announced it has completed its rolling submission of a New Drug Application (NDA) to the U.S. Food & Drug Administration (FDA) and submitted a Marketing Authorization Application (MAA) to the European Medicines Agency (EMA) for FINTEPLA (ZX008, lowdose fenfluramine) for the treatment of seizures associated with Dravet syndrome. Dravet syndrome is an intractable and difficult-to-treat epilepsy that begins in infancy and is associated with frequent, severe, and potentially life-threatening seizures, developmental delay, and cognitive impairment.
>
> Both applications are based on data from two pivotal Phase 3 trials in Dravet syndrome and an interim analysis from an ongoing open-label extension study, which included 232 patients treated for up to 21 months.

100.    In response to the February 6, 2019 press release and Form 8-K, Zogenix's stock price

increased from $45.66 per share on February 5, 2019 to $47.68 on February 6, 2019.

### February 28, 2019 Annual Report and Conference Call

101.    On February 28, 2019, the company filed its annual report on Form 10-K with the SEC

for the fiscal year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by

Defendants Farr, Smith, Garner, Bock, Breitmeyer, Hawley, Mast, Tannenbaum, and Wiggins, and

contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the

Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Farr and Smith attesting to the accuracy of

the financial statements contained therein, the disclosure of any material changes to the Company's

internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors

102.    The 2018 10-K stated, in relevant part:

> In February 2019, we completed our rolling submission of a New Drug Application (NDA) with the FDA and submitted a MAA to the EMA for Fintepla for the treatment of seizures associated with Dravet syndrome. Both applications were based on data from Study 1 and Study 1504 in Dravet syndrome and the interim analysis from Study 1503. The EMA has accepted the MAA and initiated its review.
>
> In some cases, the FDA may condition the approval of the NDA on the sponsor's agreement to conduct additional pre-clinical and clinical studies to further assess the

drug's safety and effectiveness after NDA approval.  Such post-approval studies are typically referred to as Post-Marketing or Phase 4 studies.

We are developing proprietary product candidates, including Fintepla, *for which we may seek FDA approval through the Section 505(b)(2) regulatory pathway* . . . . Section 505(b)(2) permits the filing of an NDA where at least some of the information required for approval comes from trials that were not conducted by or for the applicant and for which the applicant has not obtained a right of reference. Section 505(b)(2), if applicable to us under the FDCA, would allow an NDA we submit to the FDA to rely in part on data in the public domain or the FDA's prior conclusions regarding the safety and effectiveness of approved compounds, which could expedite the development program for our product candidates by potentially decreasing the amount of clinical data that we would need to generate in order to obtain FDA approval. *If the FDA does not allow us to pursue the Section 505(b)(2) regulatory pathway as we anticipated, we may need to conduct additional clinical trials, provide additional data and information and meet additional standards for regulatory approval.*

(Emphasis supplied).

103.    On February 28, 2019, the Company held an investor conference call to discuss the financial results of the fiscal year ended December 31, 2018.  As part of his opening remarks, Defendant Farr discussed the strides made with the Company's ZX008 NDA, but failed to disclose that the Company had not included the public toxicology report in the NDA—thereby knowingly subjecting the NDA to a high risk for rejection, stating that:

We have continued our strong momentum at the start of 2019, highlighted by the completion of the rolling submission of an NDA to the U.S. Food and Drug Administration and the submission of an MAA to the European Medicines Agency for FINTEPLA for the treatment of seizures associated with Dravet syndrome. I'm pleased to report that the EMA has now accepted our MAA for review, and we anticipate that an approvability decision could be reached by the EMA in the first quarter of 2020.

We expect to hear from the FDA in regards to the final status of our NDA submission in the next several weeks. If the FDA grants priority review for FINTEPLA NDA, we would anticipate a PDUFA [Prescription Drug User Fee Act] target date in the third quarter of this year.

These regulatory submissions represent a considerable achievement for Zogenix, and I'd like to take a moment to extend my sincere thanks to the patients and families, investigators and their staff and other experts who participated in the ZX008 clinical trial program over the last 4 years.

I'd also like to recognize all of my colleagues at Zogenix, who have worked so diligently to make these submissions a reality.  With the data obtained in our clinical Phase III

program, we firmly believe FINTEPLA has the potential to be a compelling treatment option for Dravet syndrome.

The regulatory applications in United States and Europe are based on data from the two pivotal Phase III trials in Dravet syndrome that I mentioned earlier, and an interim analysis from an ongoing open-label extension study, Study 1503, which included 232 patients treated for up to two years. Both of the pivotal trials met their primary endpoints and all key secondary measures with high statistical significance.

. . .

I would like to conclude my remarks by highlighting Zogenix' objectives for 2019. *We've already accomplished one key objective for the year with the completion of our NDA and MAA submissions*, and excited to have received confirmation today that our MAA has been accepted for review. We're now looking forward to learning of the acceptance for filing of the NDA and receiving a PDUFA target date from the FDA.

(Emphasis and brackets added.)

104.    The statements in ¶¶ 102 and 104–106 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company had not submitted the publicly available toxicology literature regarding fenfluramine pursuant to Section 505(b)(2) along with the NDA for ZX008; (2) as such, the Company was exposed to a substantial risk that the FDA would reject the application; and (3) the Company failed to maintain internal controls. As a result, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Emerges

105.    On April 8, 2019, Zogenix revealed in a press release also attached to a Form 8-K filed on the same day with the SEC that it received the RTF letter from the FDA in response to the ZX008 NDA.  According to the 8-K, the FDA determined that the NDA, submitted on February 5, 2019, was "not sufficiently complete to permit a substantive review."  The FDA cited two reasons for the RTF decision: (1) the non-clinical studies were not submitted to allow assessment of the chronic administration of fenfluramine; and (2) the application contained an incorrect version of a clinical dataset.  According to the RTF, the two deficiencies would prevent the completion of the review process necessary to support the filing of the NDA.

106.    On this news, shares of Zogenix stock plummeted from a closing price of $51.85 per share on April 8, 2019, down to $39.96 per share on April 9, 2019, on heavy trading volume.  Analysts expressed their confusion over the Company's failure to submit the toxicology studies.  Guggenheim Securities stated it was "puzzle[ed]" especially in view of the Company's "regular dialogue" with the FDA, and proceeded to downgrade Zogenix to "neutral" and lowered its price target for the Company's stock from $70 per share to $40 per share.  Ladenburg Thalmann was likewise puzzled over the Company's failure to include the toxicity literature, noting that "fenfluramine was approved in 1973 for weight loss, so the [ZX008] NDA was filed under the 505(b)(2) regulatory pathway, allowing the applicant to rely upon the non-clinical evidence from the original NDA approval."  Northland Capital Markets was similarly at a loss, noting that the FDA instructed the Company that it should not "provide non-clinical toxicology, as the NDA for [ZX008] was being filed using the 505(b)(2) pathway that would allow inclusion of toxicology data from NDA of fenfluramine, i.e., Pondimin filed in 1972."

107.    As a result of the FDA's rejection of the NDA, the Company would likely continue to incur year-over-year losses and would not be able to turn a profit.  Indeed, by March 31, 2019, the Company had accumulated a deficit of more than $731 million.

108.    On April 8, 2019, an investor call was held to discuss the RTF.  During the call, Defendant Farr demonstrated the Individual Defendants knew the toxicology studies should have been submitted with the NDA pursuant to Section 505(b):

<Paul Andrew Matteis - Stifel, Nicolaus & Company, Incorporated, Research Division - Co-Head of the Biotech Team, MD & Senior Analyst>: Steve, I just wanted to clarify. So to be clear, do you have the nonclinical toxicology data that FDA is asking for or would you have to generate this data from scratch?

<Stephen J. Farr>: We know that there are literature data on chronic toxicity with fenfluramine based upon the prior NDA for [Pondimin]. We have not started any chronic toxicology studies. We have conducted what we believe, based upon our FDA correspondence, was the appropriate nonclinical package for the NDA and that was (inaudible) with the FDA.

<Paul Andrew Matteis - Stifel, Nicolaus & Company, Incorporated, Research Division - Co-Head of the Biotech Team, MD & Senior Analyst> Okay. So did your -- so is it your expectation that there are sufficient historical nonclinical toxicology data that are

available and kind of in the mode that FDA might want them to comply with ICH guidelines? Or do you expect that you will need to generate additional data?

<Stephen J. Farr>: That is our view right now, but obviously we need to have that Type A meeting with the FDA before we can confirm that.

<Paul Andrew Matteis - Stifel, Nicolaus & Company, Incorporated, Research Division - Co-Head of the Biotech Team, MD & Senior Analyst>: But it's your view that you can leverage the old data or generate new data?

<Stephen J. Farr>: No, we can leverage the old data but we will need to confirm that obviously with the Type A meeting, that would be one of the major discussion points for that meeting.

<Paul Andrew Matteis - Stifel, Nicolaus & Company, Incorporated, Research Division - Co-Head of the Biotech Team, MD & Senior Analyst>: Okay. And then do you know, Steve, that if historically because fenfluramine was an obesity drug in adults, if chronic tox work was done in juvenile models or if that's at all relevant here?

<Stephen J. Farr>: We conducted the appropriate juvenile toxicologies for our NDA.

***Subsequent Statements Confirm the Toxicology Reports Should Have Been Submitted***

109.    Defendant Farr later admitted that the toxicology studies were publicly available prior to the filing of the NDA.  In a May 8, 2019 investor call, Farr stated that "[T]he full study reports are not in the literature.  But the findings from all the chronic toxicity studies are in the literature."

110.    On the same call, Defendant Farr also admitted that Zogenix had intended to reference the fenfluramine literature, but in the end omitted it. During an interview with a stock analyst Farr stated in relevant part:

<Tazeen Ahmad BofA Merrill Lynch, Research Division>: . . . And maybe you can just talk to us about the discussions that had taken place with the agency when you decided to look at this particular indication for this particular molecule. And when those discussions happened? And I guess, where you think the disconnect actually happened.

<Stephen J. Farr>: Well, we started down this path in -- around 2015 where we inherited regulatory minutes from a previous owner of the asset. We actually acquired the company. It's a company was called Brabant Pharma. And we obviously, as part of our diligence, we were keenly aware of the past history of fenfluramine and wanted to balance that with the remarkable data that we generated in Belgium with respect to its use in Dravet syndrome in reducing seizures and making many patients actually seizure-free.

* * *

1
2
3
4
5

We did conduct the nonclinical trials or the studies that we felt we had agreement with the FDA on. We were going to reference the chronic toxicity from the old Pondimin days, reference it through literature, and then to supplement that with nonclinical trials – or nonclinical studies, I should say, with genotoxicology and importantly, juvenile toxicology, which allowed us to really bridge from the non-chronic tox to allow us to start to dose children, and then ultimately to move forward with reproductive toxicology and cancerogenicity testing as a post-market required studies . . .

6
7
8

111.    Rather than include the critical data involving ZX008's toxicity, the Individual Defendants knowingly wagered that the strength of the Company's clinical data would forego the need for the fenfluramine data. Indeed, during the interview, Farr stated, in relevant part:

9
10
11
12
13
14
15
16
17

So we embarked upon conducting a Phase III program with very intense regulatory feedback at the time with respect to what would be required to prospectively evaluate for a potential cardiovascular signal in our Phase III program. So here we are 3-plus years later I think with really stellar data, both from an efficacy and safety perspective where we have not been -- where we have not demonstrated in any child in our program. We have over 300 children in open-label extension right now. We're continuing to monitor for echos -- for valvulopathy through echocardiography and have seen no evidence of valvulopathy or importantly for pulmonary arterial hypertension. So we feel that with respect to a cardiovascular safety signal, which led to its withdrawal from the market, we adequately addressed that in our Phase III program. It's our belief that really conducting chronic toxicity studies are not going to add to our knowledge of that because it really was not been -- was not demonstrated with any robustness in any animal model, and we've obviously studied it in humans where the safety signal had occurred. So that's where we stand.

18
19
20

112.    The Company announced on June 27, 2019 that it had held a "Type A" meeting with the FDA and would be resubmitting the NDA, this time to include "additional clinical and nonclinical literature" pertaining to fenfluramine toxicity.  The Company privately conveyed to analysts that it would be amending the NDA to include the historical chronic toxicity data.

21
22
23
24

113.    Several months later, on September 26, 2019, the Company resubmitted its NDA application, which the FDA accepted on November 25, 2019. The target action date is currently set for March 25, 2020.

25
26
27

114.    The foregoing confirms that the statements in Paragraphs ¶¶ 102, 104–106 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading.

28

**Repurchases During the Relevant Period**

115.    Upon information and belief, during the period in which the Company made false and misleading statements and omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock at artificially inflated prices that substantially damaged the Company. According to the Company's quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2019 (the "1Q 2019 10-Q"), the Company repurchased 12,000 shares[3] of its own common stock at artificially inflated prices during the three months ended March 31, 2019.

Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company overpaid for these shares and was damaged thereby.

**DAMAGES TO ZOGENIX**

116.    As a direct and proximate result of the Individual Defendants' conduct, Zogenix has lost and expended, and will lose and expend, many millions of dollars.

117.    Such expenditures include, but are not limited to, costs and fees associated with the resubmission of the NDA to the FDA, legal fees associated with the Securities Class Action filed against the Company, its President and CEO, and its Executive Vice President and CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

118.    Such losses include, but are not limited to, monies that the Company expended, at the direction of the Individual Defendants, for the Company's repurchases of its own stock at artificially inflated prices.

119.    Additionally, these expenditures include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company,

---

[3] According to the 1Q 2019 10-Q, these shares were "repurchased for tax withholdings related to net share settlement of employee equity awards."

including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

120.    As a direct and proximate result of the Individual Defendants' conduct, Zogenix has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

121.    Plaintiff brings this action derivatively and for the benefit of Zogenix to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Zogenix, waste of corporate assets, unjust enrichment, and violations of Sections 10(b) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

122.    Zogenix is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

123.    Plaintiff is, and has continuously been since before the Relevant Period, a shareholder of Zogenix. Plaintiff will adequately and fairly represent the interests of Zogenix in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

124.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

125.    A pre-suit demand on the Board of Zogenix is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven Individual Defendants: Defendants Farr, Bock, Breitmeyer, Garner, Mast, Tannenbaum, and Wiggins (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to four of the seven Directors that were on the Board at the time this action was commenced.

126.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly

or recklessly cause the Company to fail to submit with the NDA for ZX008 the non-clinical studies necessary to evaluate the toxicity of the chronic administration of fenfluramine, thereby exposing the Company's NDA to a high risk for rejection, and to make and/or cause the Company to make false and misleading statements and omissions of material facts, while two of them engaged in insider sales based on material non-public information, netting proceeds of over $2.5 million, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

127.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly caused the Company to fail to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

128.    Additional reasons that demand on Defendant Farr is futile follow. Defendant Farr is a co-founder of the Company and has served as the Company's President and CEO since its inception.  He also serves as a member of the Board.  Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Farr with his principal occupation, and he receives handsome compensation, including $6,650,252 during the fiscal year ended December 31, 2018. Defendant Farr was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the foregoing earnings call and press release, most of which he personally made statements in, and the 2018 10-K, which he signed and signed a SOX certification for. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Farr was well aware of the critical toxicity studies published on fenfluramine. During the investor call on May 8, 2019, Defendant Farr specifically admitted that Defendants were "keenly aware of the past history of fenfluramine[]" and

thus, the risk the Company was exposed to due to its incomplete submission. Yet, they chose to omit this critical information when the Company filed its NDA in February 2019. Moreover, Defendant Farr is a defendant in the Securities Class Action. For these reasons, too, Defendant Farr breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

129.    Additional reasons that demand on Defendant Bock is futile follow. Defendant Bock has served as a Company director since 2006 and is the Chairman of the Nominating/Corporate Governance Committee, in addition to serving on the Audit Committee.  Defendant Bock receives handsome compensation, including $477,899 during the fiscal year ended December 31, 2018. As a long-time Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Bock signed, and thus personally made the false and misleading statements in, the 2018 10-K. For these reasons, too, Defendant Bock breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

130.    Additional reasons that demand on Defendant Breitmeyer is futile follow. Defendant Breitmeyer has served as a Company director since 2014 and serves on the Compensation Committee. Defendant Breitmeyer receives handsome compensation, including $465,399 during the fiscal year ended December 31, 2018. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Breitmeyer signed, and thus personally made the false and misleading statements, in the 2018 10-K. For these reasons, too, Defendant Breitmeyer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

131.    Additional reasons that demand on Defendant Garner is futile follow. Defendant Garner is a co-founder of the Company and has served as Chairman of the Board of Directors since the Company's inception in 2006.  Defendant Garner also serves as the Chairman of the Compensation Committee of the Board of Directors.  Defendant Garner receives handsome compensation, including $517,899 during the fiscal year ended December 31, 2018. As a long-time Chairman of the Board of Directors, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Garner signed, and thus personally made, the false and misleading statements, in the 2018 10-K. His insider sales before the fraud was exposed, which yielded at least $1,624,924 million in proceeds, demonstrates his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Garner breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

132.    Additional reasons that demand on Defendant Mast is futile follow. Defendant Mast has served as a Company director since 2013, is the Chairman of the Audit Committee and serves on the Nominating/Corporate Governance Committee. Defendant Mast receives handsome compensation, including $487,899 during the fiscal year ended December 31, 2018. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarding his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Mast signed, and thus personally made the false and misleading statements, in the 2018 10-K. For these reasons, too, Defendant Mast breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

133.    Additional reasons that demand on Defendant Tannenbaum is futile follow. Defendant Tannenbaum has served as a Company director since 2015 and serves as a member of the Nominating/Corporate Governance Committee. Defendant Tannenbaum receives handsome compensation, including $462,899 during the fiscal year ended December 31, 2018. As a long-time

Company director she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Tannenbaum signed, and thus personally made the false and misleading statements in, the 2018 10-K. Her insider sales before the fraud was exposed, which yielded at least $886,526 in proceeds, demonstrates her motive in facilitating and participating in the fraud. For these reasons, too, Defendant Tannenbaum breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

134.   Additional reasons that demand on Defendant Wiggins is futile follow. Defendant Wiggins has served as a Company director since 2011 and is a member of the Audit Committee and the Compensation Committee. Defendant Wiggins receives handsome compensation, including $475,399 during the fiscal year ended December 31, 2018. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Wiggins signed, and thus personally made the false and misleading statements in, the 2018 10-K. For these reasons, too, Defendant Wiggins breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

135.   Additional reasons that demand on the Board is futile follow.

136.   As described above, two of the Directors on the Board directly engaged in insider trading, in violation of federal law. Defendants Garner and Tannenbaum collectively received proceeds of over $2.5 million as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and thus excused.

137.   Demand in this case is excused because the Directors, all of whom are named as defendants in this action, control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the other Individual Defendants

that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, Defendant Breitmeyer served as long-term executive officer of Cadence Pharmaceuticals, Inc., which Defendant Garner co-founded. Defendant Garner also co-founded Somaxon Pharmaceuticals, Inc., on whose Board Defendant Mast served as a director, and which Defendant Bock invested in as a partner with Scale Venture Partners. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

138.    In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to cause the Company to fail to submit with the NDA for ZX008 the non-clinical studies necessary to evaluate the toxicity of the chronic administration of fenfluramine, to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Conduct, the Directors failed to comply with the law. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

139.    Zogenix has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Zogenix any part of the damages Zogenix suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

140.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged

herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

141.    The acts complained of herein constitute violations of fiduciary duties owed by Zogenix officers and directors, and these acts are incapable of ratification.

142.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Zogenix. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Zogenix, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

143.    If there is no directors' and officers' liability insurance, then the Directors will not cause Zogenix to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

144.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

145.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

146.   The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Zogenix. Not only is Zogenix now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also a victim of the unlawful scheme perpetrated upon Zogenix by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to overpay in repurchasing 12,000 of its own shares on the open market at artificially-inflated prices, damaging Zogenix.

147.   During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

148.   The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Zogenix not misleading.

149.   The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Zogenix. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the

schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

150.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, made and signed the Company's Form 10-K filed with the SEC during the Relevant Period.

151.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

152.    Plaintiff on behalf of Zogenix has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Violations of Section 20(a) of the Exchange Act

153.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

154.    The Individual Defendants, by virtue of their positions with Zogenix and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Zogenix and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Zogenix to engage in the illegal conduct and practices complained of herein.

155.    Plaintiff on behalf of Zogenix has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

156.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

157.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Zogenix's business and affairs.

158.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

159.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Zogenix.

160.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls, exposing the Company to a substantial and undisclosed risk by to failing to submit with the NDA for ZX008 the non-clinical studies necessary to evaluate the toxicity of the chronic administration of fenfluramine.

161.    In further breach of their fiduciary duties owed to Zogenix, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company had not submitted the publicly available toxicology literature regarding fenfluramine pursuant to Section 505(b)(2) along with the NDA for ZX008; (2) as such, the Company was exposed to a substantial risk that the FDA would reject the application; and (3) the Company failed to maintain internal controls. As a result, the Company's public statements were materially false and misleading at all relevant times.

162.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

163.    In breach of their fiduciary duties, three of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein. Moreover, while the price of the Company's stock was artificially inflated, the Individual Defendants, in further breach of their fiduciary duties, caused the Company to engage in repurchasing 12,000 shares of Company stock at artificially inflated prices.

164.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public

statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

165.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the reckless and fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the reckless and fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the reckless and fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

166.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

167.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Zogenix has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

168.    Plaintiff on behalf of Zogenix has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Unjust Enrichment

169.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

170.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Zogenix.

171.   The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Zogenix that was tied to the performance or artificially inflated valuation of Zogenix, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

172.   Plaintiff, as a shareholder and a representative of Zogenix, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

173.   Plaintiff on behalf of Zogenix has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

174.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

175.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

176.   In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

177.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

178.   Plaintiff on behalf of Zogenix has no adequate remedy at law.

## **PRAYER FOR RELIEF**

179. FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)  Declaring that Plaintiff may maintain this action on behalf of Zogenix, and that Plaintiff is an adequate representative of the Company;

(b)  Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Zogenix;

(c)  Determining and awarding to Zogenix the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)  Directing Zogenix and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Zogenix and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Zogenix to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)  Awarding Zogenix restitution from the Individual Defendants, and each of them;

(f)  Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)  Granting such other and further relief as the Court may deem just and proper.

1

**<u>JURY TRIAL DEMANDED</u>**

2

    Plaintiff hereby demands a trial by jury.

3

Dated: January 17, 2020                       Respectfully submitted,

4

5

**THE ROSEN LAW FIRM, P.A.**

6

<u>/s/Laurence M. Rosen</u>
Laurence M. Rosen, Esq. (SBN 219683)

7

355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071

8

Telephone: (213) 785-2610
Facsimile: (213) 226-4684

9

Email: lrosen@rosenlegal.com

10

**THE BROWN LAW FIRM, P.C.**

11

Timothy Brown
240 Townsend Square

12

Oyster Bay, NY 11771
Telephone: (516) 922-5427

13

Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

14

15

*Counsel for Plaintiff*

16

17

18

19

20

21

22

23

24

25

26

27

28

Verified Shareholder Derivative Complaint

## <u>VERIFICATION</u>

I, Roy Lui am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2020.

1/16/2020

*Roy Lui*

318F27720007469...

Roy Lui